JOSÉ M. JARABO ET UX., Plaintiffs and Appellees, v. DR. MAX RAMÍREZ DE ARELLANO, Defendant and Appellant.

No. R-62-158.     Decided June 30, 1966.

*Francisco Ponsa Feliú* and *Alvaro Calderón, Jr.,* for appellant. *F. Fernández Cuyar* and *Amancio Arias Cestero* for appellees.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Rigau, and Mr. Justice Dávila.

PER CURIAM: José M. Jarabo and his wife, María Teresa Pérez Morris, filed an action in the Superior Court, San Juan Part, against Dr. Max Ramírez de Arellano and the Insurance Company of North America, claiming $200,000 for damages allegedly suffered as a result of an automobile accident which occurred in Ponce de León Avenue in Santurce, on May 7, 1960.

Defendants answered the complaint admitting the occurrence of the accident, and denying that it was due to the negligence of codefendant Ramírez de Arellano and that Jarabo's vehicle suffered serious damages, and admitting that Jarabo suffered physical injuries. As defenses they alleged that the complaint failed to state a claim and that "the accident described in the complaint was a purely unfortunate and fortuitous one, which occurred without any fault, carelessness, or negligence on the part of codefendant Dr. Max Ramírez de Arellano."

The trial was held during the days of September 26, 1961 and February 19, 1962, each party presenting quite abundant oral and documentary evidence. Judgment was rendered on

May 15, 1962 sustaining the complaint and fixing the amount to be paid in $62,969.52, of which amount Insurance Company of North America would pay $30,108.26. Subsequently, on codefendant's motion, the amount to be paid by the latter was reduced to $25,000.

Against this judgment codefendant Ramírez de Arellano alone has requested review, being represented by attorneys other than those he had in the trial court.

On its part, shortly after the petition for review was instituted, codefendant Insurance Company of North America deposited, "as payment and as full settlement for liabilities imposed on codefendant—on it—. . . in the judgment . . . as modified . . .", the amount of $25,264.44 in the Office of the Secretary of the trial court for plaintiffs' benefit and said amount was delivered to plaintiffs on June 25, 1962.

On July 13, 1962, a division of this Court by majority decision, denied the petition for review; yet, on the basis of a motion for reconsideration, it decided to issue the writ, one of the Justices stating that it should be issued "for the sole purpose of reviewing the amount of the compensation granted."

Appellant maintains that the trial court erred (A) in deciding that he was negligent; (B) in failing to apply the sudden emergency doctrine; (C) in deciding that the lack of the two independent brake systems in his vehicle constituted negligence per se; (D) in granting $13,951 for special nurse service and (E) in failing to decide that plaintiff acted negligently in standing with his back toward the traffic and defendant's automobile.

The parties have presented very elaborate and interesting briefs in favor of their respective positions in this review. After a conscientious examination thereof, as well as of the pleadings, of the quite extensive oral and documentary evidence introduced by both parties, and of the clear and precise findings of fact and conclusions of law made by the trial

court, we conclude that none of the errors assigned were committed and, that, therefore, the judgment will be affirmed.

The findings of fact, with the exception of No. 23, which refers to the accident insurance of codefendant Ramírez de Arellano, determined the following:

## "FINDINGS OF FACT

"1—On May 7, 1960, between 9:00 and 10:00 a.m., José María Jarabo was driving his 1960 Opel on Ponce de León Avenue in this city in an east-westerly direction, that is, from Río Piedras toward San Juan. When he was approaching a traffic light near stop 26, in front of Colegio Sagrado Corazón, the red light was on, and Jarabo brought his vehicle to a stop in the right-hand lane and right close to the center of the avenue. At that time the traffic in Ponce de León Avenue was two-way.

"2—At the same time Dr. Max Ramírez de Arellano was driving his 1958 Rambler American, immediately behind, and in the same direction of plaintiff's vehicle, and likewise stopped behind said vehicle in view of the red light.

"3—When the traffic light changed to green, either because plaintiff's car, in starting to go, retreated slightly or because defendant's car started to move forward too soon (defendant is not quite sure which of the two alternatives occurred), the American Rambler lightly struck the Opel's rear bumper with its front bumper. As a result of this impact between the vehicles, Jarabo stopped his car once more and got out to find out the damages the car had suffered. Dr. Ramírez de Arellano also stopped, and they exchanged a few words, and agreed to park at the right side of the avenue to examine plaintiff's car thus avoiding interrupting the traffic.

"4—Plaintiff actually drove his car to the right side, parked it correctly and got out and stood behind his car, his back toward Río Piedras, and started to examine the rear part of his car.

"5—From the place where the first impact already described occurred to the place where plaintiff was standing behind his parked car there was a distance of about 96 feet.

"6—Defendant also drove his car from the center of the street to the extreme right, as agreed. For that purpose, he drove at a speed of about 15 miles per hour, and when he was

already directly behind plaintiff's parked car, about 30 feet away, he tried to apply his foot brake but although the pedal went all the way down the brake did not respond. Defendant did not use the emergency brake. He admitted that after he realized that the foot brake did not work he did not swerve either to the right or to the left, nor tried to mount on the sidewalk which was then only one foot away from the right-hand tires; nor did he use the gear-shift to set the car either in first gear or 'reverse', or did anything else than pump the same pedal several times with the intent to create pressure in the hydraulic brake system.

"7—There was no evidence that defendant sounded the claxon or the horn, or gave any other warning to plaintiff while his car advanced in a straight line directly towards plaintiff, who was standing with his back to defendant's car and examining his own vehicle.

"8—As a result of the facts aforestated defendant's car collided its front part against the rear of plaintiff's car, trapping the latter between the two bumpers. Plaintiff fell to the pavement with both legs fractured in several places and the index finger of his right hand completely severed. He was immediately assisted by defendant doctor and later taken by ambulance to the municipal hospital from where, that same day, he was transferred, by ambulance also, to the Auxilio Mutuo in Hato Rey.

"9—After the accident a strong odor of brake liquid could be perceived, as well as a heavy escape of said liquid from the interior of the rear right tire of defendant's car. Right there the police checked the foot brakes and verified that the pedal went all the way down and the brakes did not work.

"10—The Rambler American had been bought brand new by defendant in August 1958. On December 2, 1959 it was taken to Garage Gómez in Hato Rey to have the rear axle and a broken retainer repaired. The rear axle was replaced by a new one, a retainer, the ball bearings and the brake 'cups' and the brake lining in the four wheels were replaced by new ones. From that date to the day of the accident in this case the brakes had worked all right. During the five months and five days between December 2, 1959 and May 7, 1960 no inspection or repair of the brake system of this vehicle was made.

"11—Said brakes were working fine on the very day of the accident, early in the morning, until, 30 feet away from the fatal impact, defendant pumped the pedal all the way down to bring the car to a stop behind plaintiff's car. It was at this point that defendant first realized that the foot brake did not work.

"12—Defendant's automobile was not equipped with two independent brake systems, each one sufficient in itself to bring the car to a stop within an adequate and prudent distance. The so-called emergency brake of this vehicle was not sufficient by itself to stop the normal speed of the vehicle in the sense that if the foot brake failed to work the emergency brake also ceased to work. Actually, the 'emergency' brake was not such, but merely a parking brake.

"13—The reason why the hydraulic foot brake failed in this particular case was that the 'cup' of the rear right wheel had a small flaw or crack through which the brake liquid escaped and, consequently, when he tried to apply his foot brake no hydraulic pressure was produced. Said small flaw or crack was, in turn, slowly and gradually produced by nicks or notches in the metal cylinder located under the 'cup'. Said nicks or notches in the metal were also produced gradually, in a slow process of deterioration by use.

"14—Subsequent to the accident the cylinder so pricked and with nicks and the cracked 'cup' were replaced by new cylinder and 'cup' in Garage Gómez.

"15—Defendant suffered grave injuries on being trapped between the bumpers of both vehicles. The index finger of his right hand was severed and fell to the pavement. It was later amputated at the next joint in the hospital and later it was necessary to operate for a second time for a complete disarticulation of the finger at the metacarpophalangeal joint, removing, at the time, the remaining tendons of that finger. The lack of that finger hinders the full use of his right hand, to such a degree that he can barely write, or shave, or comb his hair. Defendant suffered several compound polyfragmentary fractures in each leg and displacement of the upper third of the tibia and fibula, which penetrated the articular surface of both knees, resulting in the loss of tibial bone tissue. Both limbs were put in casts for several months, and on the left leg there was considerable loss of skin tissue due to necrosis of the skin,

leaving the tibia exposed. There was great ulceration which required considerable skin grafting. Plaintiff remained in the Auxilio Mutuo hospital, of which he was a member, for one year, three months and seventeen days, from May 7, 1960 to September 24, 1961. When he left the hospital he could not walk yet without the help of crutches and he has continued to receive treatment at his home, up to the present time, by his attending physician, Dr. Manuel Espinosa, a renowned orthopedist of this Capital.

"16—As a result of the injuries received in this accident, plaintiff has a permanent general disability of 62%. The prognosis is that the knees will improve but will never be cured.

"17—Defendant's physical condition after the accident was so serious that special nurse service was necessary round the clock for many months. From the strict medical point of view the special nurse service round the clock was indispensable during the first three months of confinement and during the rest of the time a special nurse was necessary every day. However, the evidence showed that from the legal point of view of the reasonableness of the damages claimed, plaintiff's expenses for special nurses during his confinement in the hospital is certainly reasonable and lawful. His constant condition of disability required such nurses all the time.

"18—Plaintiffs actually and effectively paid the following amounts of money as a result of the accident and the resulting physical injuries:

| | | |
|---|---|---:|
| "(a) | Special nurses | $13,951.00 |
| (b) | Laboratorio Arreche (Blood) | 240.00 |
| (c) | Drugs and medicines | 151.51 |
| (d) | Paid to Auxilio Mutuo (Emergency treatment, air conditioning in the room, extra bed, once in a while, for Mrs. Jarabo during the first weeks | 1,414.75 |
| (e) | Transportation expenses | 105.00 |
| | Total | $15,862.26 |

"19—The reasonable charge for the extraordinary special services rendered by Dr. Manuel Espinosa to plaintiff in addition to the regular services usually rendered in these cases is $2,000, which amount we consider extremely reasonable since

said doctor performed several important operations on the patient, visited him around 450 times, day and night, on holidays, and obviously, his services were beneficial to plaintiff.

"20—The repairs of the damages caused by the collision with plaintiff's automobile amounted to $108.26.

"21—The room occupied by plaintiff in the Auxilio Mutuo during 505 days of confinement normally amounted to $20 per day, without air conditioning, for any patient other than a member of the institution. Plaintiff was a member. The air conditioning was $2.00 a day in addition to the charge for the room. It being a warm room air conditioning was practically a necessity for the patient's comfort.

"22—Plaintiff's wife suffered extraordinary anguish, fear, preoccupations, pains and sufferings as a result of her husband's injuries, of his prolonged confinement in the hospital and the surgical operations, of the great expenses, and of her husband's serious condition during treatment, as well as of the actual permanent general disability and of his mutilated hand. The husband had, even in a greater degree, physical sufferings, mental anguish, worries, anxiety, fear, etc. which he will obviously suffer for the rest of his life, due to his permanent disability."

We can assert that appellant, in his brief—pp. 2–5—, substantially, and as herein stated, accepts the correctness of the preceding findings of fact. There is no controversy whatsoever as to the essential facts, as they appear.

A–B—These two assignments are jointly discussed. In the light of the concurring circumstances, as revealed by the evidence believed by the trial court, the sudden emergency doctrine is not applicable. We consider conclusions of law 3 and 4 on this point proper, and which read:

"3—Defendant, Dr. Max Ramírez de Arellano, was guilty of negligence or carelessness which was the sole and proximate cause of the accident involved herein. Even assuming that he had no reason to anticipate the unexpected failure of the foot brake to work at the precise moment he applied it (when approaching plaintiff's parked car) it is evident that due to inattention, carelessness or negligence he failed to take any of

the common ordinary precautions he could have taken to avoid running over plaintiff. He could and should have used his emergency brake, or put his car on 'reverse' or first gear, which would have promptly halted the slow speed of the car and thus have avoided trapping a human being whom he was seeing in front of him completely unprepared and unconscious of the approaching danger. Certainly he should have at least given some warning with his claxon or horn or in any other manner, even by shouting to him, in order that plaintiff could abandon the area of peril by merely taking one or two steps to the side. Once he realized his foot brake did not respond he could and should have swerved or cause his right front wheel to rub against the curb, which was only a foot away from said wheel, and finding this obstacle the vehicle would have promptly stopped. In failing to take any if these precautions, defendant incurred in culpable and negligent fault.

"4—The sudden emergency doctrine is not applicable to this case, since defendant did not take *any* precaution after his brakes failed to respond. Said doctrine refers to those cases where the driver *has acted in any way,* although not successful and he cannot be considered negligent for having failed to act *in any other way,* which might have been successful. Furthermore, in the present case, the 'sudden emergency' was created by defendant himself since it arose from the fact found herein that his vehicle was not equipped with a real emergency brake as required by the law. Had it been equipped with one and had defendant used it, the automobile would have normally stopped without causing a sudden emergency."

See *Banchs* v. *Colón,* 89 P.R.R. 471 (1963).

C—Defendant-appellant's actual violation of § 12 of the Traffic Law in driving an automobile in a public thoroughfare without two independent sets of brakes, each one of them being sufficient in itself to stop the automobile within a proper distance, was shown by the testimonies of mechanics Muñoz and Parsons, witnesses for defendant himself, who verified that the emergency brake of appellant's Rambler was not sufficient to bring it to a stop within a reasonable distance. As stated by the former: ". . . the vehicle stops

gradually, but it does not stop within a reasonable distance, it only works over the two rear wheels"—p. 114, Tr. Acabá.— The latter testified, among other things, that the 1958 Rambler "The brakes in the rear wheels work by means of a brake called parking brake, that is, a brake used to park. It is obvious that at that time those vehicles had an inadequate or insufficient brake system which did not respond to the requirements of the law then in force. Assuming the car had it, the evidence showed that they were not maintained in good condition, and especially that at the critical moment defendant did not make use of them. The law requires the two brake systems in order to have one available for use when the other does not respond.

■ Although the noncompliance with the statute would not constitute negligence per se, the failure to take any of the precautions indicated by the trial court in its conclusions constituted negligent conduct, which made him liable for the damages caused.

Although the facts involved in the case of *Acha* v. *Cintrón*, decided by Per Curiam of June 16, 1950, differ in certain aspects from those in the present petition, we consider it proper to cite the following paragraphs:

"In the present case, in the absence of evidence exculpating the apparent guilt or negligence of the driver of the automobile, it seems evident that the doctrine of *res ipsa loquitur* invoked by appellee would be applicable, since an automobile driven with due care and circumspection should not climb on a sidewalk. The explanation of the accident made by the driver of the vehicle did not satisfy the trial judge. Assuming the foot brake suddenly failed to respond when she tried to apply it in front of Santa Ana Church, that circumstance by itself would not excuse the accident, since foreseeing emergencies of this nature, the Law, as we have seen, requires that all automobiles be equipped with at least two systems of independent brakes each one of them being sufficient by itself to stop the vehicle

within a reasonable distance; and in the event one of them fails to respond the other is ready to meet the emergency.

"Assuming the foot brake suddenly failed to respond, as alleged by the driver of the vehicle, she has not explained why the emergency brake, which is mechanical and has no connection with the foot brake, also suddenly failed to respond at the same time the other did.

"In our opinion the trial judge was justified in concluding that the brakes of the vehicle were not in the condition required by the Automobile and Traffic Act, and that was the proximate cause of the accident. Trying to justify her negligence for the bad condition of the brakes, the driver of the automobile testified that one month prior to the accident, the vehicle was examined by a mechanic—who testified to the same effect—and that the brakes were then in good condition. Assuming this justified the accident, the court did not give credit to that evidence, which plaintiff was unable to controvert with direct evidence, since it is something within the exclusive knowledge of the driver and her witness; but there is no doubt that the physical acts are doubtful, at least, as to the veracity of said evidence."

D—Appellee Jarabo was confined in the Auxilio Mutuo, severely injured on May 7, 1960 and was discharged on September 27, 1961. There he suffered several operations and was confined for 16 consecutive months. He was later treated by doctors at his home. His attending physician made some 450 visits while he was confined in the hospital. Due to his condition special nurse service was required. Expenses for that service were totally paid by Jarabo. The reasonableness of its cost is obvious. Defendants were timely notified of its existence and details, although it is true that in the complaint the item on the account amounting to $13,951 was not specified.

E—Under the circumstances of the case, the error of the trial court in failing to decide that plaintiff acted negligently in standing with his back turned to the traffic and defendant's automobile lacks merit. It is rather a circumstance which required greater care, circumspection, and prudence on the

part of defendant. He had all the opportunities within his reach to avoid the accident.

The judgment appealed from will be affirmed.